UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

AUG 2 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| MIKEISHA BLACKMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 97-1629 (PLF) |
| ) | |
| DISTRICT OF COLUMBIA, et al., ) | |
| ) | |
| Defendants. ) | |
| | |
| JAMES JONES, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 97-2402 (PLF) |
| ) | |
| DISTRICT OF COLUMBIA, et al., ) | |
| ) | |
| Defendants. ) | |

OPINION AND ORDER

This matter is before the Court on the parties' joint motion for final approval of

the proposed Consent Decree filed on June 30, 2006. This is the fifth major proposed consent

decree in this class action, which was filed under 42 U.S.C. § 1983 and the Individuals with

Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"), and which has been ongoing for

nearly a decade.[1] Upon consideration of the history of the case, the current Consent Decree and

previous iterations, and the comments of the parties and objectors presented during and in

---

[1]      The statute was renamed the Individuals with Disabilities Education Improvement
Act ("IDEIA") when it was amended in 2004. For the sake of continuity, however, the Court
will continue to refer to it as the IDEA.

connection with the class action fairness hearing conducted on March 9 and 10 and July 17, 2006, the Court finds the Consent Decree to be fair, adequate and reasonable under Rule 23(e) of the Federal Rules of Civil Procedure. It therefore grants the parties' joint motion for final approval of the Consent Decree.

## I. BACKGROUND

This case arises from the failure of the District of Columbia Public Schools ("DCPS") to meet its statutory obligations to special education students under the Individuals with Disabilities Education Act. On July 17, 1997, plaintiffs filed a complaint in <u>Blackman v. District of Columbia</u>, Civil Action No. 97-1629, against DCPS, the District of Columbia, the Chief Executive Officer of DCPS, and the Director of Special Education for DCPS, alleging that the defendants had failed to timely respond to students' and parents' requests for administrative due process hearings pursuant to the IDEA. Three months later, on October 16, 1997, a second suit was filed against the same defendants. This case, <u>Curtis v. District of Columbia</u>, Civil Action No. 97-2402, concerned defendants' failure to timely implement Hearing Officer Determinations ("HODs") and settlement agreements ("SAs") as required by the IDEA.[2]

On October 22, 1997, the Court certified <u>Blackman</u> as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. On May 14, 1998, the Court consolidated the <u>Curtis</u> and <u>Blackman</u> cases, denied defendants' motion to decertify the <u>Blackman</u> class, certified <u>Curtis</u> as a class, and then consolidated the two classes to create a single class with two

---

[2]      For convenience, in this Opinion the Court will refer to HODs and SAs collectively as HOD/SAs.

subclasses. See Order (May 14, 1998); see also Opinion (June 3, 1998). The Blackman subclass

was defined as:

> all persons now, and in the future, who present complaints to
> DCPS pursuant to Section 615(b)(6) of the IDEA and whose
> requests for impartial due process hearings under Section 615(f) of
> the IDEA and D.C. Mun. Regs. Tit. 5, § 3021.5 are overdue
> according to those provisions; and their next friends.

Order (May 14, 1998). The Curtis subclass (now referred to as the Jones subclass) was defined

as:

> all children, now and in the future, who are entitled to have DCPS
> provide them with a free appropriate public education [FAPE] and
> who have been denied same because DCPS either (a) has failed to
> fully and timely implement the determination of hearing officers,
> or (b) failed to fully and timely implement agreements concerning
> a child's identification, evaluation, educational placement, or
> provision of FAPE that DCPS has negotiated with the child's
> parent or educational advocate.

Id. Curtis v. District of Columbia subsequently was re-captioned Jones v. District of Columbia

when Shaquette Curtis, the original named plaintiff, left the District of Columbia Public Schools

system.

On June 3, 1998, the Court granted summary judgment for plaintiffs on the issue

of defendants' liability, finding there to be no genuine issue of material fact as to defendants'

failure to meet their binding obligations to the class members under the IDEA. See Opinion

(June 3, 1998). The Court did not at that time prescribe an immediate remedy for defendants'

failure to comply with the law, and instead ordered the parties to jointly file a "proposed plan and

schedule for resolution of the issue of remedy." Order and Judgment (June 3, 1998). The Court

did so in recognition of the fact that because "the District simply [did] not have the resources to

come into immediate compliance" with the IDEA, "a broad, class-wide preliminary injunction requiring the District to immediately comply with its statutory and regulatory obligations" would be "ineffective and impractical." Blackman v. District of Columbia, 185 F.R.D. 4, 5 (D.D.C. 1999); see Order (June 3, 1998). The parties were unable to agree on a remedial plan, however, and the Court therefore scheduled a trial on the issue of remedy for June of 1999. Because the defendants' continuing failure to meet their statutory obligations threatened to cause "immediate irreparable injury" to some Blackman and Jones class members, the Court on February 12, 1999 appointed Special Master Elise Baach to facilitate the resolution of emergency motions for injunctive relief that might be filed by individual class members pending a decision on a class-wide remedy. See id. at 6-7; see also Order of Reference, Blackman v. District of Columbia, 185 F.R.D. at 16-17.

The Court also referred the parties to mediation under the auspices of the Circuit Executive's Alternative Dispute Resolution Program. On June 24, 1999, the parties filed for the Court's approval a settlement agreement and proposed consent decree intended to resolve all issues of remedy in both Blackman and Jones. The Court vacated the trial date, and granted preliminary approval of the settlement agreement on July 9, 1999. On October 1, 1999, after ordering the provision of notice to class member, the Court held a Fairness Hearing on the proposed settlement. Many members of the special education bar strenuously objected to approval of the proposed decree, both in writing and at the Fairness Hearing.

In the wake of the hearing and in response to the special education bar's many objections to the agreement, the parties on December 10, 1999 entered into a revised settlement agreement and submitted a revised proposed consent decree. Among the provisions of the new

decree were specific dates by which DCPS committed itself to clear up the backlog of unscheduled due process hearings (the "Blackman backlog") and unimplemented HOD/SAs (the "Jones backlog"). The Court did not grant either preliminary or final approval of the revised proposed consent decree, but defendants nevertheless agreed to comply with its terms on an interim basis. As defendants attempted to address the pre-existing Blackman and Jones backlogs, however, new HOD/SAs went unimplemented, and a new Jones backlog arose. See Order (Apr. 17, 2001). The defendants continued to experience difficulty in complying with the goals set by the December 1999 agreement, and ultimately, the parties and the Court agreed that it was no longer a viable settlement. The Court denied the parties' motion for final approval of the settlement agreement, without prejudice, on September 3, 2002.

The parties resumed mediation, and on September 4, 2003, they filed a second revised proposed consent decree. The Court rejected the proposed decree on June 9, 2004, because it failed to provide sufficient certainty as to what entity ultimately would be responsible for ensuring that due process hearings would be conducted and HODs issued in a timely manner. See Blackman v. District of Columbia, 321 F. Supp. 2d 99, 100 (D.D.C. 2004). The proposed decree had delegated some of the responsibility for conducting due process hearings to the District of Columbia Office of Administrative Hearings ("OAH"), which had not been a party to negotiations over the consent decree and was not a defendant in the case. As the Court observed, "[t]he cornerstone of any acceptable consent decree in these consolidated class actions must be an unequivocal commitment to providing timely due process hearings under the IDEA for the duration of the consent decree. . . . The consent decree must be very clear on whom the Court should impose sanctions for failure to comply with the IDEA or the consent decree, whether

5

those sanctions are contempt of court and/or monetary fines." Id. at 105. The Court also

expressed "deep reservations" about approving a consent decree without the endorsement of the

then-as-yet-unnamed successor to Dr. Paul Vance as superintendent of schools. Id. at 107.

      After rejection of the 2003 consent decree, the parties continued to talk of

settlement, but little apparent progress was made on the issue of remedy until, in March 2005, the

Court scheduled the case for trial for November 2005. In a Joint Status Report and Proposed

Schedule for Litigation filed on April 5, 2005, the parties jointly requested that the Court appoint

Judge David S. Tatel of the United States Court of Appeals for the District of Columbia Circuit

"or another qualified mediator" to aid the parties in a final attempt at settlement. Judge Tatel

graciously agreed to serve as mediator in the case along with a co-mediator, Amy Totenberg,

Esq., an experienced special education attorney who had worked with Judge Tatel to mediate and

settle special education class action cases in Maryland. On May 17, 2005, the Court appointed

Judge Tatel and Ms. Totenberg as co-mediators.

      On November 7, 2005, following mediation, the parties filed a third revised

proposed consent decree and motion for preliminary approval. After reviewing the new

agreement, the Court met with the parties jointly and related immediate concerns it had regarding

the form and substance of the proposal. The parties revised the document in accordance with the

Court's suggestions and submitted another agreement ("the 2005 Consent Decree") for

preliminary approval on December 19, 2005. The Court preliminarily approved the settlement

agreement on December 20, 2005, directed that notice be disseminated to class members and

potential class members, and established a schedule for the filing of written responses to the

proposed consent decree. See Order (Dec. 20, 2005).

Several parents and grandparents of students filed comments in support of the 2005 Consent Decree, as did University Legal Services, a private non-profit organization that provides advocacy for individuals with disabilities, and Advocates for Justice and Education, a community-based parent training and information center concerned specifically with the education of children with special needs.[3] Members of the special education bar filed written statements challenging the fairness, adequacy and reasonableness of the proposed decree.[4] One parent, Karla Reid-Witt, also filed written comments not explicitly supporting or opposing approval, but suggesting several improvements to the decree and to the notice afforded to class members.

A Fairness Hearing on the proposed decree commenced on March 9 and continued on March 10, 2006.  Judge Tatel reported at the hearing that the mediators, either individually or together, had met with the parties in person or on conference calls on 44 occasions, and that he and Ms. Totenberg believed the terms of the proposed decree were concrete and enforceable, demanding but realistic.  After oral presentations by the mediators and by counsel for the parties, several parents of DCPS students spoke, as did members of the special education bar.[5]  The Court, recognizing the concerns about the sufficiency of the consent decree set forth in the written submissions and in oral presentations – and expressing its own concerns

---

[3]  The parents and grandparents who filed comments on the Consent Decree were Theresa Bollech, Sheilah Hubbard, and Bettie J. Florence.

[4]  The members of the special education bar who filed written responses to the decree were Robert Berlow, Margaret Kohn, Joseph Tulman, Donna Wulkan, and Elizabeth Jester.

[5]  Several of the individuals who had filed written comments on the proposed decree spoke at the hearing, as did parents Deborah Whitted, Denise Lockley, and Mary Ann Blackman.

with the form, language and substance of certain provisions of the decree – adjourned the

Fairness Hearing and directed the parties to return to the negotiating table.  In order to guide the

parties in their renewed negotiations, the Court, on March 17, 2006, issued a Memorandum

Opinion and Order elaborating on some of its own concerns as well as those expressed by

objectors in writing and during the Fairness Hearing.  See Blackman v. District of Columbia,

2006 U.S. Dist. LEXIS 10727 (D.D.C. March 17, 2006).   The Court also scheduled a trial on the

issue of remedy to commence on July 11, 2006.

       With the invaluable assistance of Judge Tatel and Ms. Totenberg, the parties

resumed negotiations. In addition to the 44 initial sessions there were at least an additional 20

meetings or telephone conferences between the parties and the mediators during the period

leading up to the submission of another revised proposed consent decree ("the 2006 Consent

Decree") and a motion for final approval of the agreement on June 30, 2006.  The Court vacated

the trial date and ordered that the Fairness Hearing would resume on July 17, 2006.  Further

written submissions on the 2006 Decree also were invited.

       Plaintiffs' class counsel filed a brief in support of final approval, while defendants

filed a brief and two declarations in support of approval.  Only one new written objection, on

behalf of class members Carolyn Young and R.Y., was filed.  At the resumed Fairness Hearing,

class counsel and counsel for defendants made brief oral presentations.  The Superintendent of

Schools, Dr. Clifford B. Janey, spoke personally about the significance of the Consent Decree in

the context of his goal of making long-term improvements in DCPS's capacity to meet its

obligations to special education students under the IDEA.  Several members of the special

education bar provided oral comments on the 2006 Consent Decree.[6]  Special Master Elise Baach also spoke briefly about possible revisions to the Special Master referral process.

On July 27, 2006, class counsel and defendants' counsel filed a slightly revised Consent Decree incorporating minor technical changes that had been discussed fully at the Fairness Hearing.

## II.  SUBSTANTIVE PROVISIONS OF THE 2006 CONSENT DECREE

The core provisions of the 2006 Consent Decree include:

1.      A requirement that, within 30 days of final approval of the Consent Decree, DCPS timely adjudicate or settle 90% of pending hearing requests, and that no due process request be more than 90 days overdue.  2006 Consent Decree ¶ 29.

2.      A June 30, 2007 deadline for the implementation of all currently overdue HOD/SAs ("the Jones initial backlog").  Id. ¶ 41.

3.      A set of deadlines by which DCPS must timely implement progressively higher percentages of new HOD/SAs, and a set of deadlines that progressively reduce the number of days by which any particular HOD or SA may be overdue ("the Jones subsequent backlog").  Id. ¶ 42.[7]

---

[6]      The attorneys from the special education bar who spoke were Joseph Tulman, Robert Berlow, Donna Wulkan, and Ronald L. Drake.

[7]      By June 30, 2007, 50% of the then-current HOD/SAs must be timely implemented; by June 30, 2008, 65% must be timely implemented; by June 30, 2009, 80%; and by June 30, 2010, 90%.  Consent Decree ¶ 42.  By June 30, 2007, no case in the Jones subsequent backlog may be more than 180 days overdue; by June 30, 2008, no more than 150 days; by June 30, 2009, no more than 120 days; and by June 30, 2010, no more than 90 days.  Id. ¶ 42.

4.      A procedure for the annual reassessment of these requirements and their upward adjustment if circumstances so warrant. Id. ¶¶ 49.[8]

5.      A commitment by the District of Columbia to provide $5 million annually, separate and apart from the normal DCPS budget, to achieve compliance with the Jones provisions of the Consent Decree. Id. ¶ 50.

6.      A comprehensive plan to provide compensatory education to class members. Id. ¶¶ 74-82. The District of Columbia will provide an additional $10 million to fulfill defendants' obligation to provide compensatory education. Id. ¶ 82.

7.      The Court's appointment of a Monitor to oversee defendants' compliance with the Consent Decree and other binding obligations, and to report to the Court, class counsel, and defendants on her findings. Id. ¶ 83. The Monitor has other specific duties, including assisting in the resolution of certain disputes arising under the Decree. Defendants guarantee the Monitor wide access to information relevant to measuring compliance and discharging her other duties. Id. ¶¶ 88, 93.[9]

8.      The establishment of an Evaluation Team, headed by the Monitor, to help defendants achieve compliance by, *inter alia*, identifying barriers to compliance and recommending actions and strategies for overcoming those barriers. Id. ¶¶ 101-10. The Monitor and the Evaluation Team are to provide periodic reports to the defendants and plaintiffs' counsel.

---

[8]      The requirements for Jones compliance may be made more stringent under the Consent Decree; they may not be made less stringent.

[9]      The Court is very pleased that this case will continue to benefit from the talents, energy and good judgment of Amy Totenberg, as she has agreed to serve as the Monitor under the Consent Decree. See Consent Decree ¶ 84.

9.     Alternative Dispute Resolution procedures for disputes that may arise under the
Consent Decree. Id. ¶¶ 111-14.

10.    Monthly and quarterly reporting requirements with which the defendants must
comply. Id. ¶¶ 117-24.[10]

### III. DISCUSSION

Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be
dismissed, settled or compromised without the approval of the Court. FED. R. CIV. P. 23(e).
Before giving its approval, the Court must provide adequate notice to all members of the class,
conduct a fairness hearing, and find, after notice and hearing, that the "settlement is fair,
adequate and reasonable and is not the product of collusion between the parties." Thomas v.
Albright, 139 F.3d 227, 231 (D.C. Cir.), cert. denied 525 U.S. 1033 (1998); see FED. R. CIV. P.
23(e). "To determine whether a proposed settlement is fair, reasonable, and adequate, the court
must examine whether the interests of the class are better served by the settlement than by further
litigation." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.61 at 309 (2004). In deciding
whether to approve a proposed settlement, the Court must protect the interests of those unnamed
class members whose rights may be affected by the settlement of the action.

---

[10]     One question was left open by the Consent Decree: whether the defendants are
legally responsible for ensuring timely hearings and timely implementation of HODs and SAs for
charter school students? See Consent Decree ¶ 151. It was agreed that if, after briefing and
argument, the Court decides this legal question in the affirmative (in whole or in part), then
paragraph 22 (defining "school") will be amended and the terms of the Consent Decree will be
applicable to charter school students. Id. ¶ 152. If not, the definition of the plaintiff subclass will
be modified to conform to the Court's opinion, and plaintiffs' class counsel will be free to bring a
separate lawsuit with respect to the obligations of charter schools under the IDEA. Id. ¶ 153.
Pursuant to an agreed-upon schedule, briefing on that legal question has begun.

In this Circuit there is "no obligatory test" that the Court must use to determine whether a settlement is fair, adequate and reasonable. Pigford v. Glickman, 185 F.R.D. 82 (D.D.C. 1999), aff'd, 206 F.3d 1212 (D.C. Cir. 2000); Osher v. SCA Realty I, Inc., 945 F. Supp. 298, 303-04 (D.D.C. 1996). Instead, the Court must consider the facts and circumstances of the case, ascertain what factors are most relevant in the circumstances, and exercise its discretion in deciding whether approval of the proposed settlement is fair.[11] By far the most important factor is a comparison of the terms of the proposed settlement with the likely recovery that plaintiffs would realize if they were successful at trial. See Pigford v. Glickman, 206 F.3d 1212, 1217 (D.C. Cir. 2000); Thomas v. Albright, 139 F.3d at 231 ("The court's primary task is to evaluate the terms of the settlement in relation to the strength of plaintiffs' case.").

Having carefully considered the substantive terms of the 2006 Consent Decree in light of all of the objections and comments that were filed with the Court or expressed at the Fairness Hearing, as well as the nature of the relief plaintiffs likely could have obtained at trial, the Court concludes that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties.

### A.  Settlement and Class Representation

Although no objectors challenged the adequacy of class counsel or the negotiations that led to the 2006 Consent Decree, the Court finds explicitly that the 2006 Decree is the product of arms-length negotiations between experienced, extremely capable counsel. See

---

[11]     Some circuits have adopted explicit multi-factor tests for determining the fairness of a settlement of a class action, while others (including the D.C. Circuit) have refrained from imposing such rigid tests, recognizing that the relevant factors may vary depending on the factual circumstances. See Pigford v. Glickman, 185 F.R.D. at 99 n.13 (surveying cases).

Thomas v. Christopher, 169 F.R.D. 224, 238-39 (D.D.C. 1996) (quoting 2 HERBERT NEWBERG &
ALBA CONTE, NEWBERG ON CLASS ACTIONS §§ 11.28, at 11-59 (3d ed. 1992)).[12] "A
'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached
in arm's length negotiations between experienced, capable counsel after meaningful discovery.'"
In re Vitamins Antitrust Litig., 2001 WL 856290, at *1-*2 (D.D.C. July 19, 2001) (quoting
MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42 at 238 (1995)).

        The attorneys primarily responsible for negotiating the Consent Decree on behalf
of the class – Tammy Seltzer and Alisa Reff – have zealously represented the interests of the
Blackman and Jones class members for almost a decade. Ms. Seltzer entered her appearance as
class counsel in this case on December 3, 1997; Ms. Reff entered hers on February 10, 1998.[13]
Ms. Seltzer is an experienced special education attorney devoted exclusively to practice in that
area; Ms. Reff is an experienced litigator, primarily in the labor and employment fields, who has
been practicing law for over eighteen years. Both are extremely competent attorneys who have
represented the interests of the class members with integrity and zeal. The District of Columbia
likewise has been represented by experienced and extremely competent counsel, specifically
Cary Pollak and Daniel Rezneck of the Office of the Attorney General of the District of
Columbia. Mr. Pollak has been an Assistant Corporation Counsel, and now a Senior Assistant
Attorney General, for over 30 years. Mr. Rezneck, a partner at Arnold & Porter for 27 years

---

        [12]     There has been no suggestion of any collusion between class counsel and
defendants or their counsel, nor are there any facts in this case to suggest (even remotely) the
existence of collusion. See Thomas v. Albright, 139 F.3d at 231.

        [13]     Ira Burnim, Legal Director of the Bazelon Center for Mental Health Law, also
participated in the final stages of negotiations, and in the process of seeking final approval for the
2006 Consent Decree. Mr. Burnim entered his appearance as class counsel on April 10, 2006.

before returning to the public sector as General Counsel to the District of Columbia Financial

Control Board and now as Senior Assistant Attorney General, is one of the most respected

members of our Bar. Importantly, Superintendent Clifford B. Janey, City Administrator Robert

C. Bobb, and Mary Lee Phelps, until recently Executive Director of Special Education Reform

for DCPS, all were personally involved in aspects of the negotiations. DCPS General Counsel

Abbey Hairston, although newly appointed to her position, also participated in the later stages of

negotiations.

   The Court therefore is confident not only that the interests of the class members

were adequately and zealously represented in the negotiations and that both sides negotiated at

arms-length and in good faith, but also that the obligations undertaken in the Consent Decree

reflect the firm commitments of all of the defendants in this case – DCPS and its Superintendent,

the Director of Special Education, and, more broadly, the government of the District of Columbia

– to meet the demanding but realistic obligations they have undertaken. The Consent Decree

reflects not aspirational goals but defendants' most realistic assessment of their own capacity to

comply with their IDEA obligations and the terms of the Consent Decree, and their commitment

to doing so.

   The 2006 Consent Decree is at least the fifth proposed consent decree that has

been presented to the Court for approval in this case.[14] Whenever in the course of this litigation a

consent decree has been rejected by the Court or withdrawn by the parties, class counsel and

defendants eventually – sometimes with prodding from the Court or the prospect of a trial

---

   [14]  There have been several other versions of a proposed settlement, involving
relatively minor technical changes to previous proposed decrees.

looming – have shown a willingness to return to the negotiating table and address seriously whatever inadequacies might have existed in the previous iterations. This years-long process of revision and negotiation has resulted in a proposed decree that is more beneficial to the class members than any of the prior proposals, provides relief that compares favorably to what plaintiffs might have obtained at trial, and has realistic prospects for success. Class counsel and counsel for the District, operating at arms-length but in good faith – and with the encouragement, perseverance, and creativity of Judge Tatel and Ms. Totenberg – have crafted a proposal that assures that the commitments made by the District of Columbia can be met by hard work, coordination, and monitoring and oversight from within and without DCPS.[15]


## B. Substantive Fairness of Proposed Settlement

The most important factor in the Court's evaluation of a proposed class action settlement is how the relief secured by the settlement compares to the class members' likely recovery had the case gone to trial. See Pigford v. Glickman, 206 F.3d at 1217. In view of the facts and circumstances of this complex case, and the concerns raised by the objectors in the March and July 2006 sessions of the Fairness Hearing, as well as the concerns expressed by the Court orally and in its March 17, 2006 Memorandum Opinion, the Court finds the substantive provisions of the 2006 Consent Decree to represent a fair, reasonable and adequate settlement for

---

[15]     The Court expresses its deep gratitude to Judge Tatel and Ms. Totenberg for the devotion of their time, energy and significant talents to this process, as well as to Judge Tatel's dedicated law clerk, Sarah Greenberger, for her substantial contributions. Without Judge Tatel and Ms. Totenberg, this settlement would not have been possible.

the members of the <u>Blackman</u> and <u>Jones</u> classes.  This is especially so when the settlement is

compared to the relief the plaintiffs likely could have obtained at trial.[16]

### 1.  Percentages and timelines

An item of significant concern to the Court and to objectors at the March 2006

session of the Fairness Hearing was "the low percentages for timely implementation of hearing

officer determinations and settlement agreements" set forth in the 2005 Consent Decree.  The

Court was especially concerned with these numbers in light of two important facts:  First, the

2005 Consent Decree did not require DCPS immediately to resolve the pre-existing backlog of

overdue HOD/SAs (the "<u>Jones</u> initial backlog"), instead allowing DCPS until June 30, 2009 to

reduce the <u>Jones</u> initial backlog, and then only by 90%.  <u>See</u> 2005 Consent Decree at 23.  Second,

defendants did not provide along with the 2005 Decree any concrete information to substantiate

their claim that defendants actually were unable to achieve "substantially higher rates" of <u>Jones</u>

compliance for each year of the Consent Decree – in other words, that the times and percentages

set forth in the 2005 Consent Decree represented DCPS's best efforts at <u>Jones</u> compliance.

<u>Blackman v. District of Columbia</u>, 2006 U.S. Dist. LEXIS 10727, at *17-*18.

The 2006 Consent Decree adequately addresses these concerns.  First, the

percentages and timelines for <u>Jones</u> compliance in the 2006 Consent Decree are significantly

---

[16]      The 2006 Consent Decree also allays the Court's concerns about the clarity and
draftsmanship of the 2005 Decree.  Although the agreement remains (by necessity) complex and
fairly technical, through substantive structural changes and more precise drafting the parties have
rendered "the portions of the decree setting forth the standards by which compliance and
enforcement are assessed ... comprehensible not only to the attorneys and officials who have been
involved in the case for years, but also to class members" or other interested individuals.  <u>See</u>
<u>Blackman v. District of Columbia</u>, 2006 U.S. Dist. LEXIS 10727, at *21-22.

more stringent than those in the previous proposal.[17]  Moreover, DCPS proposes to meet these

more stringent goals while completely resolving the Jones initial backlog by June 30, 2007.  See

Consent Decree ¶ 41.  At the March 2006 session of the Fairness Hearing, the parties estimated

the Jones initial backlog to comprise about 2500 overdue HOD/SAs.  Blackman v. District of

Columbia, 2006 U.S. Dist. LEXIS 10727, at *17.  At the July 2006 continuation of the hearing,

the Superintendent estimated that 500 of those cases had since been resolved.

       The parties also have responded to the Court's demand that the defendants justify

the extent to which the proposed Consent Decree requires less than immediate and total

compliance with defendants' obligations under the IDEA.  Defendants have filed two

declarations in support of the proposed Jones compliance schedule.  The first, by Dr. Rebecca

Klemm, who will be a member of the Evaluation Team, relates her preliminary findings on "the

impediments to timely completion of cases in the DCPS HOD/SA process" drawn from a

statistical analysis of 200 DCPS student case files.[18]  The second declaration, from Mary Lee

Phelps, former Executive Director of Special Education Reform for DCPS, attempts to

substantiate and explain DCPS's position on the compliance dates and percentages in the 2006

Consent Decree by identifying seven specific barriers to DCPS' achievement of 100% timely

---

[17]    Blackman compliance (the timely issuance of HODs in response to due process
hearing requests) has in recent years proven significantly less problematic for defendants than
Jones compliance (timely implementation of HOD/SAs).  The 2006 Consent Decree requires
defendants to timely resolve 90% of hearing requests within 30 days of final approval of the
consent decree.  See 2006 Consent Decree ¶ 29.  The 2006 Consent Decree also requires that no
due process hearing request be more than 90 days overdue, ensuring that all hearing requests
ultimately will be responded to.  See id.

[18]    Dr. Klemm is a respected statistician who has been a consultant for over 30 years
in the area of statistics and systems analysis, who has testified numerous times as an expert
witness and has written scores of papers, articles and reports in her field.

implementation of HOD/SAs.[19]  Especially in light of the increased stringency of the <u>Jones</u>

provisions of the Consent Decree, the Court finds this evidence more than sufficient to show that

immediate <u>Jones</u> compliance at a substantially higher level simply is not possible.  At this

historic and hopeful point in the history of this litigation, it would be counterproductive for the

Court to order something that is demonstrably not achievable.  The 2006 Consent Decree,

however, does provide for the annual reassessment of the <u>Jones</u> compliance percentages, and, if

possible, their upward adjustment.  <u>See</u> Consent Decree ¶ 49.

#### 2.  Treatment of untimely <u>Blackman</u> and <u>Jones</u> cases

Another problem identified by the Court and by objectors was the 2005 Consent

Decree's failure to ensure the ultimate implementation of HOD/SAs that are not timely

implemented during the period of the Consent Decree.[20]  The Consent Decree proposed in 2003

referred to such cases as the "<u>Jones</u> subsequent backlog" and obligated defendants to make their

"best efforts" to eliminate any such backlog.  The December 2005 Consent Decree, while it

<u>required</u> defendants to timely implement specific percentages of HOD/SAs by certain dates, did

not treat the inevitable new backlog (the "subsequent backlog") separately from the "initial

backlog."  Nor did it impose upon defendants any duty to promptly deal with the initial backlog

or to deal with cases in this new backlog at any time before the date for termination of the

---

[19]     The specific issues identified by Ms. Phelps are:  (1) staffing issues; (2) transient student problems; (3) students enrolled in D.C. jail/detention facilities; (4) students in charter schools; (5) students who are wards of D.C.; (6) HOD/SAs that address numerous elements and multiple issuances for one student; and (7) data issues.

[20]     Because the current Consent Decree (and all past decrees) does not require immediate, 100% <u>Jones</u> compliance, it is inevitable that some percentage of HOD/SAs going forward will not be timely implemented.

Consent Decree. Blackman v. District of Columbia, 2006 U.S. Dist. LEXIS 10727, at *19. This was identified by the Court as a "serious infirmity" of the 2005 Decree, and was discussed by objectors at the Fairness Hearing. See id. at *19-*20.

The 2006 Consent Decree adequately addresses the Jones initial backlog by requiring that it be disposed of in its entirety by June 30, 2007. See Consent Decree ¶ 41. It deals with the subsequent backlog primarily by imposing on defendants a continuing duty to ensure that no case in the Jones subsequent backlog is more than a set number of days overdue. Id. ¶ 42. As of June 30, 2007, the maximum overdue period is 180 days; a year later, the maximum overdue period decreases to 150 days; the period decreases by 30 days each year until by June 30, 2010, no HOD/SA may be more than 90 days overdue. See Consent Decree ¶ 42. Like the Jones compliance percentages, these maximum overdue periods may be adjusted downward if circumstances warrant, but under no circumstances may they be made any less stringent. See id. ¶ 49. By mandating that no HOD/SA may be more than a certain number of days overdue, the 2006 Consent Decree ensures that every overdue HOD/SA will be implemented, and that a subsequent Jones backlog will not (as it has in the past) accumulate over time.

The 2006 Consent Decree also allows individual Blackman and Jones class members to obtain injunctive relief from the Court if necessary, by leaving in effect the referral process embodied in the Order of Reference to the Special Master issued by the Court on February 12, 1999. See 2006 Consent Decree ¶¶ 133-34.[21] Several of the commenters did argue

---

[21]     The Consent Decree specifically states that defendants' compliance with the "overall requirements and timetables" in the Decree "shall not relieve them of their obligations to individual class members[.]" Consent Decree ¶ 133. Moreover, once defendants have met their

19

at the Fairness Hearing that the current Special Master process is not an efficient vehicle for

independent relief. The commenters observed that because it requires the preparation and filing

of a motion for preliminary injunction in federal court, the process is effectively unavailable to

students and parents who cannot afford to retain an attorney experienced in federal court

litigation (as some members of the special education bar are not), to say nothing of those who

cannot afford to hire an attorney at all.[22]  As reported by the Special Master at the Fairness

Hearing, however, the parties have committed to negotiating a streamlined process that would

make it procedurally less cumbersome for class members aggrieved by an overdue hearing

request or unimplemented HOD/SA to obtain relief from the Special Master or the Court.[23]

### 3. Monitoring, evaluation and enforcement

Although they were not discussed in detail during the Fairness Hearing and were

not the subject of any objection, the Court finds it worthwhile to consider briefly the monitoring,

evaluation and enforcement provisions of the 2006 Consent Decree.  The Decree provides clear

mechanisms by which the defendants may be held to the commitments they have made in the

---

obligations for termination under the Consent Decree, the termination of this case will not bar
any future lawsuit against the District of Columbia or DCPS based on the claim that a standard of
compliance greater than that set out in the Consent Decree is required by federal or District of
Columbia law.  See id. ¶ 132.

[22]      This problem is likely to be exacerbated by the attorney fee caps embodied in the
District of Columbia Appropriations Act of 2000-2006.  In a decision issued on July 21, 2006,
the D.C. Circuit interpreted the fee cap in the 2002 Appropriations Act to apply to the payment of
attorneys' fees awarded to counsel who prevail on motions for preliminary injunction filed in this
case.  See Blackman v. District of Columbia, 2006 U.S. App. LEXIS 18307, at *20-*27 (D.C.
Cir. July 21, 2006).

[23]      As the Court noted at the March Fairness Hearing, such revised procedures would
not ease the substantive requirements for the issuance of a preliminary injunction by the Court.

Consent Decree. These involve the Monitor's notification to the Court and the parties when it appears that defendants will be unable to meet any of their obligations under the Decree, see Consent Decree ¶ 83, the provision of alternative dispute resolution procedures (paid for by defendants) to resolve disputes arising under the Decree, see id. ¶¶ 111-16, and direct enforcement of most provisions of the Consent Decree by the Court. See id. 113-14.[24]

Fundamental to these enforcement provisions are the information-gathering mechanisms for monitoring and evaluation put in place by the Consent Decree. Defendants are required to maintain an accurate and reliable system for tracking implementation of HOD/SAs, and to report on their own compliance with their IDEA obligations. See Consent Decree ¶¶ 60-66, 117-24. The Monitor also is guaranteed wide access to additional information regarding hearing requests and the implementation of HOD/SAs. See id. ¶¶ 88, 93. The Evaluation Team established by the Monitor will critically analyze this information in an effort to help defendants overcome systemic barriers to Blackman and Jones compliance. See id. ¶¶ 101-10.

A significant impediment to negotiations in this case and to defendants' ability to comply with their IDEA obligations always has been a paucity of reliable information about DCPS's handling of individual HOD/SAs – and, by extension, about the systemic barriers to Jones compliance. The Court believes that by providing for cooperative information-gathering

---

[24]     The parties must avail themselves of ADR procedures before seeking judicial enforcement of most provisions of the Consent Decree, and when defendants are in compliance with the timely hearing/timely implementation provisions of Paragraphs 29 through 30 and 41 through 43, class counsel may not seek judicial enforcement of certain more peripheral provisions of the Decree. See Consent Decree ¶ 114. This does not, however, detract significantly from the Court's ability to oversee and enforce the implementation of the Decree.

and reporting, as well as for critical analysis of the data produced, the Consent Decree will significantly increase defendants' prospects of achieving IDEA compliance going forward.

### 4. What the parties could have achieved at trial

The most important metric of the fairness, reasonableness, and adequacy of a class settlement is how the relief secured by the settlement compares to what the parties could have obtained at trial. See Pigford v. Glickman, 206 F.3d at 1217; Thomas v. Albright, 139 F.3d at 231; MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.62 at 315 (2004) ("Adequacy of the settlement involves comparison of the relief granted relative to what class members might have obtained without using the class action process."). Here, that comparison weighs heavily in favor of approving the Consent Decree.

Plaintiffs long ago prevailed on the issue of defendants' liability for their failure to meet their IDEA obligations. As a result, a trial in this case would have focused only on the fashioning of an appropriate equitable remedy. The Court recognized in granting summary judgment for plaintiffs – and it has been clear from the subsequent history of this litigation – that simply ordering defendants to come into immediate compliance with all IDEA requirements would not have resulted in instant relief for class members. Realistically, the more likely result, unfortunately, would have been endless rounds of contempt litigation arising from defendants' almost inevitable inability to comply overnight with such an order. Plaintiffs' task in the remedy phase of a trial, then, would have been to prove just how stringent a compliance schedule the Court could order, without calling on the defendants to do the impossible.

22

For the Court to determine the defendants' future ability to comply with their IDEA obligations on any particular timetable – to say nothing of plaintiffs' ability to prove such a fact – would have been a difficult task indeed. Class counsel acknowledged at the Fairness Hearing that, had the case gone to trial, plaintiffs likely would have been unable to prove defendants' ability to achieve the compliance levels set by the 2006 Consent Decree, if only because of the difficulties they had faced in obtaining reliable and complete information through adversary discovery mechanisms, and through the analyses by experts who would be called as witnesses.

The obligations for Blackman and Jones compliance actually embodied in the 2006 Consent Decree, however, now are informed by data – for example, the case studies prepared by attorneys from Arnold & Porter, and the preliminary analysis performed by Dr. Klemm – that are likely to be more accurate, objective, and complete than what could have been obtained through adversary discovery or plaintiffs' expert witnesses.[25]  Moreover, by authorizing and funding the Evaluation Team going forward, the Consent Decree will facilitate the further development of information as to defendants' true capability to comply with their IDEA obligations and the obstacles to achieving compliance. If this information reveals that DCPS is able to perform at higher levels than those set by the Consent Decree, those numerical goals may be adjusted upward. Thus, with respect to the schedules and percentages for Blackman and Jones

---

[25]     The Court is grateful to the Lawyers Committee for Civil Rights Under Law and the lawyers and legal assistants at Arnold & Porter who, at Judge Tatel's request and under the supervision of Ms. Totenberg, reviewed, on very short notice (between March 17 and June 30), 183 special education files, created very useful data-entry forms and produced data that served as a basis for the evidentiary/data foundation for the declaration submitted by Dr. Klemm, and ultimately for the parties' agreement, and helped to create a more streamlined data-entry system.

compliance, the relief provided by the Consent Decree compares favorably with that which could
have been obtained at trial.

Significantly, the 2006 Consent Decree also provides the class with many
substantial benefits that never could have been obtained at trial because they either were outside
the scope of the original class complaints, or would have been beyond the scope of appropriate,
Court-ordered injunctive relief.  See Pigford v. Glickman, 185 F.R.D. at 110-11 (D.D.C. 1999).
These include:  (1) the mobilization of the Evaluation Team; (2) the District's provision of $5
million annually for Jones compliance, above and beyond the DCPS budget; (3) a comprehensive
compensatory education scheme and the District's provision of $10 million for its
implementation; (4) the requirement that DCPS implement an accurate and reliable data
collection system; (5) defendants' maintenance of a "Parent Service Center" to assist parents of
special education students in understanding and securing their rights under the IDEA; and
(6) defendants' revision of the DCPS principal and teacher evaluation forms.  Thus, in addition
to affording objective relief (the Blackman and Jones compliance schedules) that compares
favorably to that which plaintiffs might have obtained at trial, the Consent Decree secures
concessions from defendants that simply would not have been available other than by settlement.

### III. CONCLUSION

For the foregoing reasons, the Court finds that the Consent Decree submitted by
the parties on June 30, 2006 (and submitted in slightly revised form on July 27, 2006) provides
fair, reasonable, and adequate relief to both the Blackman and the Jones class members.  Indeed,
the terms of the Decree – with its firm, realistic and enforceable timetables – and the

24

commitment of DCPS, the Superintendent, and the District of Columbia government to meeting their statutory obligations to special needs children make this an historic and hopeful moment not only for the active litigants in this case, but also for the children of the District of Columbia, their parents and guardians, and those in every profession who work to provide them with the education and opportunities to which they are justly entitled.  The Court therefore will grant the parties' joint motion for final approval and enter the Consent Decree and proposed Order of Reference to the Monitor.  Accordingly, it is hereby

ORDERED that [1846] the parties' joint motion for final approval of the consent decree is GRANTED.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8/24/06